## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEREMIAH J. LYNCH, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 3:2005-201 |
| | ) (Consolidated with Civil Action No. 05-211J) |
| WALTER ROBERTSON, III, and | ) |
| JOHNSTOWN WIRE | ) JUDGE GIBSON |
| TECHNOLOGIES, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

**GIBSON, J.**

### I. SYNOPSIS

This matter comes before the Court on a Motion for Summary Judgment filed by the Defendants, Walter Robertson, III ("Robertson"), and Johnstown Wire Technologies ("Johnstown Wire") [collectively referred to as the "Defendants"], pursuant to Federal Rule of Civil Procedure 56. (Document No. 31). The Plaintiff, Jeremiah J. Lynch, Jr. ("Lynch" or the "Plaintiff"), opposes the Defendants' Motion for Summary Judgment. (Document No. 37). This controversy arises out of Johnstown Wire's decision to terminate Lynch's employment as a part of a reduction-in-force action.

### II. BACKGROUND

Lynch was born on March 22, 1944. (Document Nos. 38, p. 6, ¶ 1, 45, p. 1, ¶ 1). He was employed by Bethlehem Steel in Lackawanna, New York, from 1966 through 1988. (Document Nos. 38, p. 6, ¶ 2, 45, p. 1, ¶ 2). In 1988, Lynch was transferred to Bethlehem Steel's Bar, Rod and Wire

1

Division, which is located in Johnstown, Pennsylvania. (Document Nos. 38, p. 7, ¶ 3, 45, p. 1, ¶ 3). After serving some time as the scheduling manager of the rod mill, he was promoted to the position of Director of Customer and Production Services. *Id.* Johnstown Wire was established in 1992, when Bethlehem Steel sold its Bar, Rod and Wire Division. (Document Nos. 38, p. 7, ¶ 4, 45, p. 1, ¶ 4). Johnstown Wire maintains its headquarters and primary production facility in Johnstown. *Id.* It manufactures steel wire products for the automotive and construction industries. (Document Nos. 38, p. 7, ¶ 5, 45, p. 1, ¶ 5). In 1993, Johnstown Wire hired Lynch to be its Materials Manager, which required him to handle purchasing duties. (Document Nos. 38, p. 7, ¶ 6, 45, p. 1, ¶ 6).

As a former employee of Bethlehem Steel, Lynch was eligible for health coverage under Bethlehem Steel's plan. (Document Nos. 38, p. 7, ¶ 7, 45, p. 1, ¶ 7). The premiums for this insurance were paid by Johnstown Wire. *Id.* Roughly forty percent (40%) of Johnstown Wire's original employees were eligible for coverage under the Bethlehem Steel health plan. (Document Nos. 38, p. 7, ¶ 8, 45, p. 1, ¶ 8). Instead of placing these employees on its own health plan, Johnstown Wire reimbursed these employees for their premiums under the Bethlehem Steel plan. *Id.*

Terry Buxbaum ("Buxbaum"), a former employee of Bethlehem Steel, was hired in 1992 as Johnstown Wire's Manager of Human Resources. (Document Nos. 38, p. 7, ¶ 9, 45, p. 1, ¶ 9). He is responsible for handling issues related to labor and equal employment opportunities. (Document Nos. 38, p. 7, ¶ 10, 45, p. 1, ¶ 10). Although Buxbaum handled union-related matters while employed by Bethlehem Steel, he was not responsible for issues related to equal employment opportunities. (Document Nos. 38, p. 8, ¶ 11, 45, p. 1, ¶ 11).

Johnstown Wire's senior management consisted of the President, the Director of Quality

2

Assurance, the Vice-president of Sales, the Vice-president of Finance, the Materials Manager and the Manager of Human Resources. (Document Nos. 38, p. 8, ¶ 12, 45, p. 1, ¶ 12). As the Materials Manager, Lynch was responsible for negotiating with domestic and foreign suppliers, managing the inventory, analyzing the rod inventory, developing a reliable supply network, developing a purchasing strategy, and preparing bimonthly reports for the Board of Directors. (Document Nos. 38, p. 8, ¶ 14, 45, p. 2, ¶ 14).

Robertson was hired as the President of Johnstown Wire in 1998. (Document Nos. 38, p. 8, ¶ 15, 45, p. 2, ¶ 15). Lynch reported to Robertson until March 2003, when Lynch was discharged. *Id.* As the President, Robertson is responsible for Johnstown Wire's day-to-day operations. (Document Nos. 38, p. 8, ¶ 16, 45, p. 2, ¶ 16). He is also a member of the Board of Directors. *Id.* From 1998 until Lynch's discharge, Lynch and Robertson traveled together extensively for the purpose of visiting suppliers. (Document Nos. 38, p. 8, ¶ 17, 45, p. 2, ¶ 17). Lynch, who had the authority to negotiate on behalf of Johnstown Wire, kept Robertson apprised of negotiations during that period of time. (Document Nos. 38, p. 8, ¶¶ 17-18, 45, p. 2, ¶¶ 17-18). Johnstown Wire considered Lynch's job performance to be good. (Document Nos. 38, p. 9, ¶ 19, 45, p. 2, ¶ 19). In 2002 and 2003, approximately 275-280 people were employed at Johnstown Wire's Johnstown facility. (Document Nos. 38, p. 9, ¶ 20, 45, p. 2, ¶ 20).

Rick Kaltreider ("Kaltreider") was born on March 11, 1972, making him thirty-one (31) years old as of March 11, 2003. (Document Nos. 38, p. 9, ¶ 22, 45, p. 2, ¶ 22). Kaltreider was hired by Johnstown Wire as a temporary clerical worker in March 1999. (Document Nos. 38, p. 9, ¶ 21, 45, p. 2, ¶ 21). Three months later, in June 1999, Buxbaum hired Kaltreider as a permanent employee. *Id.*

3

Kaltreider was initially assigned to the switchboard, but he also performed miscellaneous purchasing, sales and finance duties. (Document Nos. 38, p. 9, ¶ 23, 45, p. 2, ¶ 23). By 2001, Kaltreider was no longer assigned to the switchboard. (Document Nos. 38, p. 9, ¶ 24, 45, p. 2, ¶ 24). He began to assist Lynch, his supervisor, in the area of purchasing. (Document Nos. 38, p. 9, ¶¶ 24-25, 45, p. 2, ¶¶ 24-25). As Lynch's assistant, Kaltreider entered orders and receipts, formulated inventory forecasts and dealt with suppliers for the purpose of expediting orders. (Document Nos. 38, p. 9, ¶ 26, 45, p. 2, ¶ 26).

In order to teach Kaltreider about purchasing, Lynch explained to him the logic behind the strategic moves made by Johnstown Wire in connection with the purchase of raw materials. (Document Nos. 38, p. 9, ¶ 27, 45, p. 2, ¶ 27). Lynch taught Kaltreider about grade codes, different kinds of steel purchased by Johnstown Wire, and the specific sizes of the purchases. (Document Nos. 38, p. 9, ¶ 28, 45, p. 2, ¶ 28). Kaltreider, who saw himself as Lynch's apprentice, performed some of Lynch's duties when Lynch was traveling. (Document Nos. 38, p. 10, ¶¶ 29-30, 45, pp. 2-3, ¶¶ 29-30). In November 2002, Lynch recommended that Kaltreider's salary be increased to $25,000.00. (Document Nos. 38, p. 10, ¶ 32, 45, p. 3, ¶ 32).

From 1995 through 2002, an investment capital firm known as Dublin & Clark owned a controlling interest in Johnstown Wire. (Document Nos. 38, p. 10, ¶ 34, 45, p. 3, ¶ 34). Because Johnstown Wire was undercapitalized, Robertson began to look for other investors in 2002. (Document Nos. 38, p. 10, ¶ 35, 45, p. 3, ¶ 35). One of Johnstown Wire's sub-debt lenders, Banc of America, agreed in October 2002 to invest an additional $5 million dollars in Johnstown Wire in return for a controlling interest in the company. (Document Nos. 38, p. 10, ¶ 36, 45, p. 3, ¶ 36). This agreement was contingent on the willingness of the members of Johnstown Wire's management to invest in the

4

company as well. *Id.* Although no specific amount was requested from individual managers, Banc of America wanted to make sure that the managers themselves had a stake in Johnstown Wire's success. (Document Nos. 38, p. 10, ¶ 37, 45, p. 3, ¶ 37). The managers collectively invested approximately $600,000.00, for which they were given a note and an equity interest in Johnstown Wire. (Document Nos. 38, p. 11, ¶ 39, 45, p. 3, ¶ 39).

In September 2002, Robertson asked Lynch how long he intended to continue working. (Document Nos. 38, p. 11, ¶ 41, 45, p. 3, ¶ 41). Lynch responded by saying that he planned to work for at least five more years. (Document Nos. 38, p. 11, ¶ 42, 45, p. 4, ¶ 42). After a recapitalization in October 2002, Johnstown Wire's Board of Directors consisted of three members. (Document Nos. 38, p. 11, ¶ 45, 45, p. 4, ¶ 45). They were Tom Clark ("Clark") of Dublin & Clark, Walker Poole ("Poole") of Banc of America, and Robertson. *Id.* At a meeting on November 21, 2002, Robertson reported that salaries would increase by five percent (5%) in 2003. (Document Nos. 38, p. 11, ¶ 46, 45, p. 4, ¶ 46). This was expected to cost Johnstown Wire approximately $140,000.00. *Id.*

On December 26, 2002, Lynch went to UPMC Lee Regional Hospital ("Lee Regional") with severe chest pains. (Document Nos. 38, p. 12, ¶ 47, 45, p. 4, ¶ 47). Having been diagnosed with unstable angina, pending myocardial infarction and severe occlusive coronary artery disease, he remained hospitalized at Lee Regional until December 29, 2002. (Document Nos. 38, p. 12, ¶¶ 47-48, 45, p. 4, ¶¶ 47-48). On the first day of his admission, Lynch had coronary bypass surgery. (Document Nos. 38, p. 12, ¶ 49, 45, p. 4, ¶ 49). Because of his serious health problems, he did not return to work until February 18, 2003. (Document Nos. 38, p. 12, ¶ 50, 45, p. 4, ¶ 50). On June 26, 2003, a permanent pacemaker was surgically installed to correct Lynch's atrial fibrillation, which he had

5

experienced since his coronary bypass operation. (Document Nos. 38, p. 12, ¶ 52, 45, p. 4, ¶ 52).

Johnstown Wire has no specific written policy addressing salaried employees' rights under the Family and Medical Leave Act ("FMLA") [29 U.S.C. § 2601 *et seq.*]. (Document Nos. 38, p. 12, ¶ 53, 45, p. 4, ¶ 53). Pursuant to an established policy of Johnstown Wire, Lynch received salary continuation benefits until his return to work on February 18, 2003. (Document Nos. 38, p. 13, ¶ 56, 45, p. 4, ¶ 56). For this reason, he was paid for the entire period of his medical leave, which began on December 26, 2002, and ended on February 17, 2003. (Document Nos. 32, p. 2, ¶ 11, 38, p.2, ¶ 11). He was medically cleared to return to work as of February 17, 2003. (Document Nos. 38, p. 13, ¶ 57, 45, p. 4, ¶ 57). While he was away from work recuperating from the first operation, Lynch gave Robertson and Kaltreider work-related advice on various occasions. (Document Nos. 38, p. 13, ¶ 58, 45, p. 4, ¶ 58). After returning to work, Lynch continued to attend cardiac rehabilitation sessions on Monday, Wednesday and Friday mornings from 9:00-10:00 A.M. (Document Nos. 38, p. 13, ¶ 59, 45, p. 4, ¶ 59). Robertson and Buxbaum were aware of Lynch's attendance at these sessions. (Document Nos. 38, p. 13, ¶ 60, 45, p. 5, ¶ 60).

Due to financial problems, Johnstown Wire laid off certain salaried and hourly employees in 2002. (Document Nos. 32, p. 6, ¶¶ 43-44, 38, p. 5, ¶¶ 43-44). In January 2003, Robertson, Poole and Clark met in Charlotte, North Carolina, to discuss Johnstown Wire's financial problems. (Document Nos. 38, p. 13, ¶ 61, 45, p. 5, ¶ 61). At the meeting, Poole and Clark instructed Robertson to cut costs by reducing the number of employees. (Document Nos. 38, p. 14, ¶ 62, 45, p. 5, ¶ 62). They wanted Roy L. Gindlesperger ("Gindlesperger"), Johnstown Wire's 59-year-old Controller, discharged for performance-related reasons. (Document Nos. 38, p. 14, ¶ 63, 45, p. 5, ¶ 63). Aside from

6

recommending Gindlesperger's termination, Poole and Clark were not involved in determining who should be discharged. *Id.* Although Robertson was not given a specific benchmark, he believed that the cuts needed to be substantial because of Johnstown Wire's poor financial condition. (Document Nos. 38, p. 14, ¶ 64, 45, p. 5, ¶ 64).

Around the same period of time, Johnstown Wire learned that Bethlehem Steel, which was in bankruptcy, planned to terminate its health plan. (Document Nos. 38, p. 14, ¶ 66, 45, p. 5, ¶ 66). A Board of Directors meeting was held on January 27, 2003. (Document Nos. 38, p. 14, ¶ 67, 45, p. 5, ¶ 67). At the meeting, Buxbaum reported that Johnstown Wire's health insurance costs would increase by approximately $15,000.00 per month if the sixty (60) former employees of Bethlehem Steel were transferred to Johnstown Wire's health plan. *Id.* After returning to Johnstown, Robertson and Buxbaum met to discuss which salaried employees should be terminated. (Document Nos. 38, p. 14, ¶ 68, 45, p. 5, ¶ 68). They considered which employees' duties could be performed by others, and which jobs could easily be rolled into other jobs. (Document Nos. 38, p. 14, ¶ 69, 45, p. 5, ¶ 69). This period of consideration lasted for approximately one month. (Document Nos. 38, p. 14, ¶ 70, 45, p. 5, ¶ 70). Robertson and Buxbaum gave no consideration to the FMLA in determining which employees should be terminated. (Document Nos. 38, p. 14, ¶ 71, 45, p. 5, ¶ 71). Although Gindlesperger was slated to be discharged for performance-related reasons, job performance was not considered with respect to the other employees chosen for termination. (Document Nos. 38, p. 15, ¶ 72, 45, p. 5, ¶ 72).

The final decisions as to who would be terminated were made by Robertson, and Buxbaum concurred in those decisions. (Document Nos. 38, p. 15, ¶ 73, 45, p. 5, ¶ 73). By the middle of February 2003, Robertson had told Buxbaum that he (Robertson) could handle Lynch's purchasing

7

duties. (Document Nos. 38, p. 15, ¶ 74, 45, p. 5, ¶ 74). Robertson and Buxbaum decided to terminate five salaried employees. (Document Nos. 38, p. 15, ¶ 76, 45, p. 5, ¶ 76). Gindlesperger and Lynch were two of the salaried employees chosen for termination. *Id.* The three others were Operations Manager Larry Keiser ("Keiser"), Regional Sales Manager Walter Robertson IV ("Robertson IV"), and Manager Maintenance Coordinator Ted Buczek ("Buczek"). *Id.* At the time, Lynch[1] and Gindlesperger were both fifty-nine (59) years old. *Id.* Keiser, Robertson IV and Buczek were forty-seven (47), thirty-four (34) and fifty-eight (58) years of age, respectively. *Id.* Gindlesperger was asked to continue working until the end of 2003, while Johnstown Wire looked for a replacement. (Document Nos. 38, p. 15, ¶ 77, 45, p. 5, ¶ 77). With Gindlesperger included, the average age of those selected for termination was 51.4. (Document Nos. 38, p. 15, ¶ 78, 45, p. 5, ¶ 78). If Gindlesperger is excluded, the average age of those selected for termination was 49.5. (Document No. 45, p. 5, ¶ 78). Buczek was rehired by Johnstown Wire as a consultant in 2005. (Document Nos. 32, p. 6, ¶ 39, 38, p. 5, ¶ 39).

At the time of his discharge, Lynch knew from his interactions with suppliers that Johnstown Wire's sales had fallen off and that its business conditions were deteriorating. (Document Nos. 32, p. 3, ¶¶ 16-17, 38, p. 2. ¶¶ 16-17). Despite the company's financial difficulties, Johnstown Wire did not cancel the country club memberships that it provided for Robertson and two other members of its management. (Document Nos. 38, p. 15, ¶ 79, 45, p. 6, ¶ 79). Moreover, Johnstown Wire opted not to cancel leased cars for Robertson and certain members of its sales force. (Document Nos. 38, p. 16,

---

[1]Lynch was born on March 22, 1944. (Document Nos. 38, p. 6, ¶ 1, 45, p. 1, ¶ 1). He learned of his impending termination on March 11, 2003. (Document Nos. 38, p. 16, ¶ 82, 45, p. 6, ¶ 82). Nevertheless, his termination was not effective until the end of March 2003. (Document Nos. 38, p. 16, ¶ 83, 45, p. 6, ¶ 83). Accordingly, he was fifty-eight (58) years old when he learned of his termination, and fifty-nine (59) years old when it became effective. For all practical purposes, this distinction is inconsequential.

8

¶ 80, 45, p. 6, ¶ 80). In 2003, Johnstown Wire implemented a five percent (5%) across-the-board pay raise for its employees. (Document Nos. 38, p. 16, ¶ 81, 45, p. 6, ¶ 81). This pay raise came at a cost of approximately $140,000.00. *Id.* Johnstown Wire did not add any salaried positions in 2004. (Document Nos. 32, p. 6, ¶ 49, 38, p. 6, ¶ 49).

On March 11, 2003, Robertson informed Lynch that he was being terminated. (Document Nos. 38, p. 16, ¶ 82, 45, p. 6, ¶ 82). Having been told that he could either leave immediately or continue working until the end of the month, Lynch opted to work through the duration of March. (Document Nos. 38, p. 16, ¶ 83, 45, p. 6, ¶ 83). Robertson told Lynch that while his job performance was good, his discharge was necessitated by a need to cut costs. (Document Nos. 38, p. 16, ¶¶ 82-84, 45, p. 6, ¶¶ 82-84). In his deposition, Robertson admitted that he and Kaltreider had developed a productive working relationship while Lynch was on medical leave. (Document Nos. 38, p. 16, ¶ 86, 45, p. 6, ¶ 86).

Before the filing of the instant lawsuit, Buxbaum and Robertson were unaware of the Older Worker Benefit Protection Act ("OWBPA") [29 U.S.C. § 626(f)(1)]. (Document Nos. 38, p. 16, ¶ 87, 45, p. 6, ¶ 87). The OWBPA provides, in pertinent part, that "[a]n individual may not waive any right or claim under [the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*] unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f)(1). On March 18, 2003, Buxbaum gave Lynch a letter discussing the terms of his termination. (Document Nos. 38, p. 17, ¶¶ 88-91, 45, p. 6, ¶¶ 88-91). The substantive portion of the letter stated as follows:

> I regret having to inform you that as a result of economic conditions and a realignment of work assignments within the company, your job has been eliminated. In consideration of your service at Johnstown Wire Technologies, Inc., the company is

9

offering the following severance agreement:

> • Your active employment with the company is terminated on March 31, 2003.
>
> • Your salary will be continued through July 31, 2003.
>
> • Your remaining 20 days of 2003 vacation will be paid on April 15, 2003.
>
> • JWT will continue to support your Bethlehem Steel health care and provide JWT dental and vision coverage through July 31, 2003.
>
> • The company's contribution to your 401k will terminate on March 31, 2003. At that time, you may withdraw or rollover your vested 401k monies as permitted by the Plan.
>
> It is understood that the above offer is mutually acceptable and the company is held harmless from any claims of wrongful termination with any government agency or any other litigation concerning your employment with JWT.
>
> You may revoke acceptance of this proposal during the seven days following the signing date by notifying the company in writing. It is understood that if you do not revoke acceptance, the agreement will be deemed accepted on the eighth day following the signature date.

(Document No. 38-4, pp. 45-46). Buxbaum used the same type of release with respect to the other

Johnstown Wire employees who were terminated in 2003. (Document Nos. 38, p. 17, ¶ 92, 45, p. 6,

¶ 92). Lynch signed the purported release on March 28, 2003. (Document Nos. 38, p. 18, ¶ 99, 45, p.

7, ¶ 99). At the time of his termination, Lynch's annual salary was $80,256.00. (Document Nos. 32,

p. 5, ¶ 33, 38, p. 4, ¶ 33).

In January 2003, Kaltreider was promoted to the position of Materials Coordinator. (Document

Nos. 38, p. 18, ¶ 101, 45, p. 7, ¶ 101). According to Buxbaum, the job description for this position was

not prepared until April 2003, after Lynch had already been terminated. *Id.* At the time of Lynch's

discharge, Kaltreider was thirty-one (31) years old. (Document Nos. 38, p. 18, ¶ 102, 45, p. 7, ¶ 102).

10

Kaltreider did not see the job description until a few weeks before his deposition in the instant case. (Document Nos. 38, p. 18, ¶ 103, 45, p. 7, ¶ 103). At his deposition, Kaltreider testified about a meeting that he had with Buxbaum and Robertson, at which he was told that he would continue to have the same responsibilities as before but that he would report directly to Robertson (rather than to Lynch, who was no longer employed by Johnstown Wire). (Document Nos. 38, p. 18, ¶ 104, 45, p. 7, ¶ 104). He further testified about being told that he would be an exempt employee in the Materials Coordinator position. (Document Nos. 38, p. 19, ¶ 105, 45, p. 7, ¶ 105). According to Kaltreider's W-2 forms, his earnings increased from $32,054.66 in 2002 to $42,380.03 in 2003. (Document Nos. 38, p. 19, ¶ 106, 45, p. 7, ¶ 106). While the parties disagree as to the precise nature of Kaltreider's duties, they agree that he is less qualified than Lynch to perform purchasing duties for Johnstown Wire. (Document Nos. 38, pp. 19-21, ¶¶ 107-123, 45, pp. 7-8, ¶¶ 107-123).

On December 8, 2003, Lynch filed a charge of discrimination ("EEOC charge") with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of the OWBPA and the Age Discrimination in Employment Act ("ADEA") [29 U.S.C. § 621 *et seq.*]. (Document No. 38-8, pp. 36-40). He alleged that his discharge was not for economic reasons, and that the economic reasons asserted by Johnstown Wire for his discharge were merely a pretext for age discrimination. (*Id.*, p. 36). With respect to the OWBPA, Lynch's EEOC charge stated as follows:

On March 18, 2003, I was informed by Respondent's Manager of Human Resources that my employment was being terminated effective March 31, 2003 due to economic conditions and a realignment of work assignments within the company. Respondent also presented me with a release that provided for 120 days of salary continuation and health Benefits. I signed the release but did not have an opportunity to consult legal counsel before I signed the release. I do not believe that release [sic] complies with the requirements of the Older Worker Benefit Protection Act because it does not reference

11

the ADEA, does not state that I should consult with an attorney, does not provide 21
days for me to accept the release, and does not state that I do not waive any rights or
claims that may arise after the date of the agreement.

*Id.* The OWBPA specifically enumerates the minimal requirements for a waiver of rights under the

ADEA to be effective, and the language contained in Lynch's EEOC charge specifically refers to the

criteria found in 29 U.S.C. § 626(f)(B)-(C), (E)-(F).

Buxbaum responded to Lynch's EEOC charge in a letter to the EEOC dated July 14, 2004,

denying that Johnstown Wire had violated the ADEA and insisting that certain jobs had been

"eliminated without any prejudice concerning age." (Document No. 38-4, p. 40). The letter further

stated that, after Lynch's discharge, Robertson had assumed his purchasing and negotiating functions

and that Kaltreider had taken over his clerical and recordkeeping duties. (*Id.*, p. 41). In a written

determination dated January 11, 2005, Joseph M. Hardiman III ("Hardiman"), the Director of the

EEOC's Pittsburgh Area Office, stated as follows:

Based on this analysis, I have determined that the evidence obtained during the
investigation establishes a violation of the Age Discrimination Act on behalf of Mr.
Lynch and other members of the protected age group who were voluntarily terminated
by the company during 2003 and were denied rights as required by the OWBPA. I have
further determined that the Charging Party, as an individual, was discriminated against
because of his age, when his position was terminated and the majority of his duties were
subsequently assumed by his former assistant, age 31.

Upon finding that there is reason to believe that violations have occurred, the
Commission attempts to eliminate the alleged unlawful practices by informal methods
of conciliation. Therefore, the Commission now invites the parties to join with it in
reaching a just resolution of this matter.

(Document No. 38-5, p. 7). On March 18, 2005, Lynch commenced this action against Robertson under

the FMLA. (Document No. 1). Thereafter, on April 8, 2005, Lynch commenced an action against

Johnstown Wire under the ADEA. (CV-05-211J, Document 1). By that time, his EEOC charge had

been pending for more than sixty (60) days, thereby satisfying the durational requirement of 29 U.S.C.

§ 626(d). These actions were consolidated on July 25, 2005, pursuant to an order of the Court.

(Document No. 8). The Defendants filed a Motion for Summary Judgment on July 21, 2006, which is

currently before the Court for decision. (Document No. 31).

## III. SUMMARY JUDGMENT STANDARDS

> Summary judgment is appropriate only when it is demonstrated that there is no genuine
> issue as to any material fact and the moving party is entitled to judgment as a matter of
> law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552-57, 91
> L.Ed.2d 265, 273-280 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine
> 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving
> party.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91
> L.Ed.2d 202, 211-212 (1986). In deciding a motion for summary judgment, all
> reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. And
> Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638 (3d Cir. 1993)]."

*Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

> As to materiality, the substantive law will identify which facts are material. Only
> disputes over facts that might affect the outcome of the suit under the governing law
> will properly preclude the entry of summary judgment. Factual disputes that are
> irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller,
> & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality
> inquiry is independent of and separate from the question of the incorporation of the
> evidentiary standard into the summary judgment determination. That is, while the
> materiality determination rests on the substantive law, it is the substantive law's
> identification of which facts are critical and which facts are irrelevant that governs. Any
> proof or evidentiary requirements imposed by the substantive law are not germane to
> this inquiry, since materiality is only a criterion for categorizing factual disputes in their
> relation to the legal elements of the claim and not a criterion for evaluating the
> evidentiary underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

## IV. JURISDICTION AND VENUE

The Court has jurisdiction in this case pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §§ 216(b), 626(b)-(c), 2617(a)(2). Venue is proper under 28 U.S.C. § 1391(b).

## V. DISCUSSION

In his complaint against Johnstown Wire, Lynch alleges a violation of the ADEA. (CV-05-211J, Document No. 1, ¶¶ 19-26). In his complaint against Robertson, Lynch alleges violations of the FMLA for both interference with his rights thereunder and retaliation for invoking the same. (Document No. 1, ¶¶ 18-28). The Defendants move for summary judgment with respect to all three counts. (Document No. 31). The Court will discuss each count separately.

### A. Age Discrimination Under the ADEA

The count against Johnstown Wire alleges a violation of the ADEA. (CV-05-211J, Document No. 1, ¶¶ 19-26). Johnstown Wire concedes that the release signed by Lynch on March 28, 2003, did not constitute a waiver of Lynch's rights under the ADEA, since it clearly failed to meet the requirements of the OWBPA. (Document No. 45, p. 6, ¶ 94)("Defendants' release is ineffective to waive Plaintiff's federal age discrimination claims.").

Johnstown Wire does not dispute that it is "a person[2] engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year[.]" 29 U.S.C. § 630(b). Consequently, it is an "employer" within the meaning of the ADEA. At the time of the alleged discrimination, Lynch was an "employee" under

---

[2]The ADEA defines a "person" as "one or more individuals, partnerships, associations, labor organizations, corporations, business trusts, legal representatives, or any organized groups of persons." 29 U.S.C. § 630(a).

29 U.S.C. § 630(f). The relevant substantive provisions of the ADEA provide:

§ 623. Prohibition of age discrimination

(a) Employer practices. It shall be unlawful for an employer--

(1) to fail or refuse to hire or to dischar ge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this Act.

29 U.S.C. § 623(a)(1)-(3). Under § 631(a), the prohibitions contained in the ADEA are "limited to individuals who are at least 40 years of age." Hence, only those 40 years of age and over may invoke the protections of the ADEA. In *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004), the United States Supreme Court held that the ADEA does not prohibit discrimination against younger individuals. The Supreme Court explained that the words "because of such individual's age," as they appear in § 623(a)(1), essentially mean "because of such individual's [old or advanced] age." *General Dynamics*, 540 U.S. at 594-600, 124 S.Ct. at 1245-1249, 157 L.Ed.2d at 1109-1113. Unlike many other employment discrimination statutes, which prohibit certain types of trait-based discrimination in both directions, the ADEA only prohibits age discrimination in one direction (*i.e.*, discrimination which favors the young and disfavors the old).

Since this is a federal employment discrimination case in which no direct evidence of discrimination is presented, the general analysis adopted by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), provides the formulation for allocating the appropriate burdens of proof and production in evaluating the instant

15

Motion for Summary Judgment.[3] As a general matter, in a federal employment discrimination case, the plaintiff must establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677-678. If a *prima facie* case is established, the defendant must then articulate a legitimate, nondiscriminatory reason for treating the plaintiff (*i.e.*, the employee) in an adverse manner. *McDonnell Douglas*, 411 U.S. at 802-803, 93 S .Ct. at 1824-1825, 36 L.Ed.2d at 678. If the defendant articulates a legitimate, nondiscriminatory reason for the employee's treatment, the plaintiff can defeat a motion for summary judgment by pointing to some evidence, direct or circumstantial, from which a finder of fact could reasonably either "disbelieve the employer's articulated legitimate reasons" or "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

The *McDonnell Douglas* framework does not apply in cases in which direct evidence of discrimination is presented. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 997, 152 L.Ed.2d 1, 9 (2002). Direct evidence of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the *prima facie* case to shift the burden of production." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096, n. 4 (3d

---

[3]The Supreme Court has not held that the *McDonnell Douglas* framework is applicable to ADEA cases. Instead, it has assumed *arguendo* that the *McDonnell Douglas* framework applies in this context. *Smith v. City of Jackson*, 544 U.S. 228, 252, 125 S.Ct. 1536, 1551, 161 L.Ed.2d 410, 429 (2005)(O'Connor, J., concurring in the judgment); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105, 116 (2000); *O'Connor v. Consolidated Coin Caterers Corporation*, 517 U.S. 308, 311, 116 S.Ct. 1307, 1309-1310, 134 L.Ed.2d 433, 438 (1996). Nevertheless, the United States Court of Appeals for the Third Circuit has held that ADEA cases should be analyzed pursuant to the *McDonnell Douglas* burden-shifting framework, with the appropriate modifications necessary to properly evaluate ADEA claims. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)(*en banc*). Accordingly, this Court will apply *McDonnell Douglas* in the present case.

16

Cir. 1995). In such cases, there is no need for an "inference of discrimination," since the discrimination is readily apparent. Where the *McDonnell Douglas* framework does apply, "the precise elements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz*, 534 U.S. at 512, 122 S.Ct. at 997, 152 L.Ed.2d at 9, quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). In *Jones v. School District of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit explained that "the elements of a *prima facie* case depend on the facts of the particular case[,]" and that "a *prima facie* case cannot be established on a one-size-fits-all basis." Thus, "the *prima facie* test remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. United States Postal Service*, 352 F.3d 789, 797-798 (3d Cir. 2003).

In the instant case, the relevant question is whether a reasonable jury could conclude that Lynch was "discharge[d]" or "otherwise discriminate[d] against" because of his age. 29 U.S.C. § 623(a)(1). He was discharged *because of his age* if his age "actually motivated" Johnstown Wire's decision to discharge him. *Glanzman v. Metropolitan Management Corporation*, 391 F.3d 506, 512 (3d Cir. 2004). In this context, Lynch's age "actually motivated" Johnstown Wire's decision to discharge him if it actually played a role in Johnstown Wire's decisionmaking process and "had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105, 116 (2000). The *prima facie* case, of course, must be viewed through that prism. In order to establish a *prima facie* case of age discrimination under the ADEA, Lynch must show that: (1) he was in the class of persons protected by the ADEA (*i.e.*, he was "at least 40 years of age" within the meaning of § 631(a)); (2) he was qualified for the position at issue (*i.e.*, he was qualified for

17

the position that he held prior to being discharged); (3) he suffered an adverse employment action (*i.e.*, he was "discharge[d]" or "otherwise discriminate[d] against" for purposes of § 623(a)(1)); and (4) he suffered this adverse employment action under circumstances giving rise to an inference of age discrimination. *Monaco v. American General Assurance Company*, 359 F.3d 296, 300 (3d Cir. 2004).

The present case is what is commonly referred to as a "reduction-in-force" case. Under these circumstances, to satisfy the fourth element of his *prima facie* case, Lynch must show that, after his discharge, Johnstown Wire "retained someone *similarly situated* to him who was *sufficiently younger*." *Anderson v. Conrail*, 297 F.3d 242, 250 (3d Cir. 2002)(emphasis added). "[I]n order to determine who might qualify as a similarly situated employee, the Court must 'look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace.'" *Klinman v. JDS Uniphase Corporation*, 439 F.Supp.2d 401, 405 (E.D.Pa. 2006), quoting *Monaco*, 359 F.3d at 305. Lynch does not have to show that the retained employee was *identically situated* in order to show that he was *similarly situated*. *Klinman*, 439 F.Supp.2d at 405. In making a determination as to whether a retained employee was similarly situated to Lynch, the Court must "undertake a fact-intensive inquiry" within the context of this case, thereby avoiding the temptation to proceed in "a mechanistic and inflexible manner." *Monaco*, 359 F.3d at 305. If Lynch cannot show that a retained employee was similarly situated to him, or if he cannot show that such similarly situated employee was *sufficiently younger* than him to permit an inference of age discrimination, he can satisfy the fourth element by presenting additional, case-specific evidence which tends to support an inference that he was discharged on account of his age. *Fitzpatrick v. National Mobile Television*, 364 F.Supp.2d 483, 491-492, n. 4 (M.D.Pa. 2005). Such additional evidence, when combined with evidence that a retained

18

employee was either *dissimilarly situated* to or *insufficiently younger* than Lynch, may be enough to

surmount the *prima facie* hurdle under unique circumstances. *Jehling v. Mellon Bank, N.A.*, 2006 WL

1508963, at *6, 2006 U.S. LEXIS 35240, at *16-17 (W.D.Pa. May 31, 2006)("Although the Court of

Appeals for the Third Circuit has not yet established a bright line rule regarding the age difference that

will satisfy the 'sufficiently younger' element, it has found that *absent other evidence*, an age difference

of as much as seven years is not sufficient to support an inference of discrimination.")(emphasis added).

As in any case, the factors must be evaluated not according to a rigid formula, but rather for the purpose

of determining their *evidentiary value* (or lack thereof) in creating an inference that Lynch's age had

a determinative influence (or did not have a determinative influence) on Johnstown Wire's decision to

discharge him rather than somebody else. *O'Connor v. Consolidated Coin Caterers Corporation*, 517

U.S. 308, 312-313, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433, 438-439 (1996).

With respect to the *prima facie* stage, the fourth element is the only element at issue. There is

no dispute that Lynch was fifty-eight (58) years old when he learned of his termination and fifty-nine

(59) years old when it became effective. (Document Nos. 38, pp. 6, 16, ¶¶ 1, 82-83, 45, pp. 1, 6, ¶¶ 1,

82-83). Therefore, at the time of the alleged discrimination, he was "at least 40 years of age" for

purposes of § 631(a). The Court does not understand Johnstown Wire's position to be that Lynch was

not qualified for the position that he held prior to his termination. Indeed, the parties agree that his job

performance had been good, and that he was more qualified than Kaltreider to perform the duties of the

position. (Document Nos. 38, pp. 16, 19-21, ¶¶ 82-84, 107-123, 45, pp. 6-8, ¶¶ 82-84, 107-123).

Moreover, it is clear that Lynch's dismissal constituted a "discharge" within the meaning of § 623(a)(1).

The dispute between the parties concerns whether he was dismissed *because of his age*. For purposes

19

of the fourth element of the *prima facie* inquiry, the parties disagree as to whether Lynch was replaced by Robertson or Kaltreider, and as to whether Lynch and Kaltreider were similarly situated. (Document Nos. 33, pp. 4-8, 43, pp. 3-6, 44, pp. 5-7, 9-13). Since Kaltreider is slightly less (eleven days less) than twenty-eight (28) years younger than Lynch, he was *sufficiently younger* than Lynch to create an inference of age discrimination. (Document Nos. 38, p. 9, ¶ 22, 45, p. 2, ¶ 22). Robertson is only one year younger than Lynch and, therefore, *insufficiently younger* to create an inference of age discrimination. (Document No. 33, p. 4). Thus, the question of whether Lynch was replaced by Robertson or Kaltreider is of particular importance to the *prima facie* inquiry. Moreover, if Lynch was replaced by Kaltreider, the question of whether the two were *similarly situated* is of great significance as well.

Before addressing the substantive issues related to the pending Motion for Summary Judgment, the Court must determine whether consideration should be given to the testimony and notes of Carl J. Bartolomucci ("Bartolomucci"), an EEOC investigator. The parties dispute the extent to which Bartolomucci's testimony and notes should be considered. The Defendants contend that Bartolomucci's testimony about what Kaltreider told him during the course of an investigation constitutes inadmissible hearsay. (Document No. 33, pp. 20-22). Lynch argues that the applicable portions of Bartolomucci's testimony are admissible as admissions of a party opponent under *Federal Rule of Evidence 801(d)(2)(D)*, since Kaltreider was speaking to Bartolomucci concerning a matter within the scope of his employment with Johnstown Wire. (Document No. 43, p. 21). In its reply brief, Johnstown Wire asserts that the Court should not accord weight to the EEOC's findings because they are not reliable. (Document No. 44, pp. 10-11). Although Johnstown Wire cites six decisions upholding the exclusion

20

of administrative determinations on the ground that the prejudicial impact of such determinations outweighs their probative value for purposes of *Federal Rule of Evidence 403*, the Court does not understand Johnstown Wire to argue (at least at this stage) that the EEOC's findings are inadmissible. *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1099, n. 12 (3d Cir. 1995); *Angelo v. Bucharach Instrument Co.*, 555 F.2d 1164, 1176 (3d Cir. 1977); *Walton v. Eaton Corp.*, 563 F.2d 66, 75 (3d Cir. 1977); *Lathem v. Dept. of Children & Youth Services*, 172 F.3d 786, 791-792 (11th Cir. 1999); *Hall v. Western Prod. Co.*, 988 F.2d 1050, 1058 (10th Cir. 1993); *Tulloss v. Near North Montessori School, Inc.*, 776 F.2d 150, 154 (7th Cir. 1985). Admissibility and weight are distinct issues, since evidence may be admissible but nevertheless be entitled to very little weight.

With respect to Bartolomucci's testimony and notes, it appears to the Court that a distinction must be made between the two. Under *Federal Rule of Evidence 803(8)(C)*, "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . factual findings resulting from an investigation made pursuant to authority granted by law" are within an exception to the hearsay rule, "unless the sources of information or other circumstances indicate lack or trustworthiness." *Fed.R.Evid. 803(8)(C)*. Although the parties have not briefed the applicability of *Rule 803(8)(C)* to this issue (which is probably explained by the fact that Johnstown Wire has made no coherent objection to the admission of the notes themselves, as opposed to Bartolomucci's testimony), Bartolomucci's notes appear to the Court to be within the exception to the hearsay rule provided by *Rule 803(8)(C)*. Assuming that to be the case, the Court observes that such notes are not *per se* admissible, since they (like any other form of evidence) can be excluded under *Federal Rule of Evidence 403* if their probative value is outweighed by their prejudicial impact. *Coleman v. Home Depot, Inc.*, 306 F.3d

1333, 1335 (3d Cir. 2002). Since the Defendants state, in a conclusory manner, that Bartolomucci's notes and testimony constitute inadmissible hearsay, they do not specifically address the question of whether Bartolomucci's notes should be excluded under *Rule 403* (assuming that they are admissible under *Rule 803(8)(C)*). (Document No. 33, pp. 20-22). They focus on the fact that Bartolomucci's recorded recollections of his interview with Kaltreider do not constitute a "statement" of Kaltreider within the meaning of *Rule 801(d)(2)(D)*. (Document No. 44, pp. 6-7). While that may be true, it is difficult to fathom how the notes could not be characterized as "[r]ecords, reports, statements, or data compilations, *in any form*, of public offices or agencies" within the meaning of *Rule 803(8)(C)*.

Johnstown Wire's argument is problematic for another reason as well. In an attempt to downplay the weight that should be given to the EEOC's determination, Johnstown Wire relies on the decision of the United States Court of Appeals for the Third Circuit in *Walton v. Eaton Corp.*, 563 F.2d 66, 75 (3d Cir. 1977), which apparently upheld a district court's exclusion of an EEOC determination *because* the court had permitted other portions of the file to be admitted, along with the testimony of an EEOC investigator. *Walton*, 563 F.2d at 75, n. 12 ("We note that although the court refused to admit the EEOC's findings of fact and its determination, the court admitted portions of the file compiled by the EEOC and permitted an EEOC investigator to testify."). While the Court acknowledges that Johnstown Wire's reliance on *Walton* is based on a different issue (*i.e.*, the weight to be accorded the EEOC's determination) than the admissibility of Bartolomucci's notes and testimony, it does not appear that *Walton* helps Johnstown Wire's argument with respect to the admissibility issue.

Johnstown Wire appears to question the reliability of the EEOC's investigation by calling the Court's attention to letters sent by Lynch to prospective employers. (Document No. 44, p. 11, n. 5).

22

In these letters, Lynch explained that his position at Johnstown Wire had been eliminated "due to economic conditions effecting [sic] the industry[,]" and that his purchasing duties at Johnstown Wire would be performed by the President (*i.e.*, Robertson). (Document No. 32-6, p. 53). He sent letters to various employers which essentially said the same thing (*i.e.*, that he was terminated because of economic conditions, and that his duties at Johnstown Wire were being performed by the President). (*Id.*, pp. 1-53). Johnstown Wire argues that Lynch's failure to affirmatively provide the EEOC with copies of these letters undermined the reliability of the EEOC's investigation. (Document No. 44, p. 11, n. 5). This argument is without merit.

First of all, Johnstown Wire makes no attempt to explain why Lynch's letters to prospective employers were relevant to the EEOC's investigation. Secondly, to the extent that Johnstown Wire believes that Lynch's own words (within the context of letters to prospective employers) were inconsistent with what he was telling the EEOC, the Court fully understands the explanation given by Lynch during his deposition for telling prospective employers that his duties were being performed by Robertson rather than by Kaltreider. As Lynch explained during the course of his deposition, it was more impressive to prospective employers to hear that he had essentially been replaced by the President of Johnstown Wire, rather than by someone with minimal qualifications. (Document No. 38-7. p. 29). Moreover, Lynch noted that had he made statements about age discrimination in letters to prospective employers, he would have discouraged them from hiring him. (*Id.*, p. 12). Consequently, he wanted to word things in a way which was "favorable to the situation without lying." *Id.* It cannot be doubted that a person's words must always be considered in context, and that an applicant for employment has a strong incentive to paint a prettier picture than reality would otherwise dictate. That is not to say that

23

Lynch's letters were disingenuous, or that he lied to prospective employers in an effort to secure employment. The Court simply acknowledges the reality that an individual seeking a job is likely to emphasize positives more than negatives, and to avoid saying anything that would make a prospective employer hesitant to extend an offer of employment. *Republican Party of Minnesota v. White*, 536 U.S. 765, 780, 122 S.Ct. 2528, 2537, 153 L.Ed.2d 694, 708 (2002)(referring to promises made by candidates for political office as "the least binding form of human commitment"). An employer receiving a letter from an applicant describing violations of federal employment discrimination statutes might be inclined to discard the applicant altogether, presuming that he or she may very well make similar charges against other employers in the future. Expecting someone in Lynch's position to inform prospective employers that he was terminated in violation of the ADEA or the FMLA (at least in his opinion) would be like expecting someone seeking a job in a convenience store to disclose that he or she had lost a previous job due to false accusations of theft or embezzlement. Johnstown Wire's argument simply fails to appreciate the realities of the job market, and the way in which job-seekers typically communicate with those for whom they wish to work. Since the EEOC apparently never requested that Lynch provide it with copies of these letters, the contents of which were largely irrelevant to the EEOC's investigation, the Court cannot conclude that the integrity of the investigation was compromised.

The Court concludes that the notes taken by Bartolomucci do not "indicate lack of trustworthiness" for purposes of *Rule 803(8)(C)*. At this point, Johnstown Wire does not specifically argue that these notes are inadmissible under *Rule 403*. Therefore, the Court's consideration of this issue is limited to the question of whether Bartolomucci's notes are within an exception to the hearsay rule. Since the Court believes them to be within the exception provided by *Rule 803(8)(C)*, they do not

24

constitute inadmissible hearsay for purposes of the present Motion for Summary Judgment. No opinion is expressed as to whether this evidence should be excluded for other reasons, and Johnstown Wire remains free to object to its admission under *Rule 403* at a later time. *Coleman*, 306 F.3d at 1335; *Cambra v. The Restaurant School*, 2005 WL 2886220, at \*2-5, 2005 U.S. Dist. LEXIS 26231, at \*8-16 (E.D.Pa. November 2, 2005). Moreover, the Court expresses no opinion as to whether the EEOC's determination letter is admissible, since it is not the subject of Johnstown Wire's evidentiary argument. Johnstown Wire's arguments do not appear to distinguish between Bartolomucci's testimony and notes. (Document Nos. 33, pp. 20-22, 44, pp. 6-7). Although the Court will consider Bartolomucci's testimony for summary judgment purposes on the ground that the testimony objected to on hearsay grounds is within the scope of *Rule 801(d)(2)(D)*, Johnstown Wire remains free to argue, at a later time, that this testimony should be excluded pursuant to *Rule 403*. With that in mind, the Court now turns to the merits of Lynch's claim against Johnstown Wire under the ADEA.

While the parties strenuously disagree as to whether Lynch was replaced by Robertson or Kaltreider, the minutes of the Board of Directors meeting dated March 13, 2003, indicate that Lynch was being replaced by *both* Robertson and Kaltreider, and that his duties were being distributed between the two of them. (Document No. 32-7, p. 1). In his deposition, Robertson testified that he had begun to assume purchasing duties after Lynch's termination, and that he had previously left such duties to Lynch. (Document No. 38-9, p. 7). He explained that Kaltreider provided him with "clerical support" and the inventory information necessary to make purchasing decisions. (*Id.*, pp. 13-17). According to Robertson, he made purchasing decisions himself after Lynch's departure, but he told Kaltreider that he would need to get good information from him in order to make those decisions. (*Id.*, pp. 14, 16).

25

Robertson further stated that he and Kaltreider "had gotten into a little bit of a rhythm" during Lynch's medical leave, and that this had confirmed Johnstown Wire's ability to function without Lynch. (*Id.*, pp. 17-18).

Kaltreider testified that his title changed after Lynch's termination, at which point he became the Materials Coordinator. (Document No. 38-6, p. 10). He explained that while his base salary increased, he was actually losing money because he became ineligible for overtime pay. *Id.* He described his job as a "desk job" consisting of "tedious clerical" work. (*Id.*, p. 19). No additional training was provided to Kaltreider after Lynch was dismissed. (*Id.*, p. 18). Kaltreider further testified that he was not qualified to perform the duties of Lynch's job, and that he was only performing "parts of" Lynch's former position at Johnstown Wire. (*Id.*, p. 19). Apparently, Robertson never said that Kaltreider would be taking over negotiations with suppliers. (*Id.*, p. 11).

With respect to his particular duties, Kaltreider testified that he sometimes engaged in "informal," rather than "formal," pricing negotiations. (*Id.*, p. 11). During Lynch's medical leave, Kaltreider made inquiries and handled inventory management duties. (*Id.*, p. 13). Nevertheless, he did not make calls to salesmen. *Id.* After Lynch's departure, Kaltreider became responsible for inquiries. *Id.* Kaltreider explained that, at the time of Lynch's termination, he performed a significant number of Lynch's duties because Lynch's productivity had fallen off. (*Id.*, p. 7). He testified as follows:

[Attorney Kunkel]: By the time Jerry Lynch left the company, were you doing everything that Jerry did except for dealing directly with vendors and suppliers?

[Kaltreider]: Jerry wasn't doing much at the time he left the company because he was coming back off of an absence. There was a period where he had an absence for I

26

think–unfortunately he had two deaths. His mother and father I think both died. And then he had a health issue, the heart issue that he left for. So that was a period of almost 6 to 8 months that it was kind of off and on. You know, I was really doing more of what I usually did when he was on vacation or traveling or something. So at the time that he came back in March and told me that his position was being terminated, the only thing that Jerry was doing that I wasn't already able to do was the price negotiations with the rod suppliers, you know, the trade shows. I always call it the cushy part of the job. I had the desk job for the most part. He had the formal dinners, the negotiations. He chose who we bought from, how we were going to get it there. The management of the rod inventory was kind of something that I learned while he was gone. I was forced into it just by kind of learning it by necessity.

(*Id.*, pp. 7-8). Kaltreider further explained that while he would often seek to buy steel, he did so only within the guidelines given to him by Robertson. (*Id.*, p. 18).

Kaltreider acknowledged that Robertson was not doing as much traveling as Lynch had done, but he attributed that more to changes in the applicable business practices rather than to an indication that Robertson had not assumed Lynch's purchasing duties. (*Id.*, p. 15). According to Kaltreider, pricing negotiations had become less necessary because price indices had become available, thereby providing the relevant information without the need for extensive negotiations. (*Id.*, p. 16). The crux of Kaltreider's testimony was that neither he nor Robertson had solely assumed all of Lynch's duties.

Buxbaum testified that, during Lynch's medical leave, Robertson and Kaltreider had split Lynch's duties. (Document No. 38-4, p. 10). He explained that Robertson performed some of Lynch's duties, while Kaltreider continued to do clerical work. *Id.* According to Buxbaum, Kaltreider never handled the purchasing of raw materials or the pricing negotiations with suppliers. (*Id.*, p. 11). Buxbaum initially opposed the decision to terminate Lynch, but he was apparently convinced that such an action was in the best interests of Johnstown Wire. (*Id.*, p. 20). He testified that, even after Lynch's

27

discharge, Kaltreider was not performing negotiating and purchasing duties. (*Id.*, p. 25).

While the parties strenuously dispute whether Lynch was replaced by Robertson or Lynch, there is sufficient evidence to enable a reasonable jury to find that he was replaced by either or both of them. In his deposition, Lynch testified that he was told that his duties would be shared by Robertson and Kaltreider. (Document No. 38-7, p. 18). The precise division of these duties is what is in dispute, and the Court is convinced that there is a genuine issue of material fact as to this issue. Since a reasonable jury could conclude that Lynch was replaced by Kaltreider, a sufficiently younger individual, the Court must determine whether there is sufficient evidence to enable a reasonable jury to conclude that Lynch and Kaltreider were similarly situated. To overcome this hurdle, it is not necessary for Lynch to establish that he and Kaltreider were *identically situated*. *Klinman*, 439 F.Supp.2d at 405. In order to determine whether Lynch and Kaltreider were similarly situated, "the Court must 'look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace.'" *Id.*, quoting *Monaco*, 359 F.3d at 305. This evaluation is a "fact-intensive inquiry" that must proceed in a case-specific fashion rather than in a "mechanistic and inflexible manner." *Id.*

While the evidence of record does not paint a clear picture of Kaltreider's duties, either before or after Lynch's termination, that may be due to the gray areas separating Kaltreider's job from Lynch's job. As noted earlier, the minutes of the Board of Directors' meeting indicate that Lynch's duties were to be *distributed between* Robertson and Kaltreider. (Document No. 32-7, p. 1). Consequently, it is clear that at least *some* of Lynch's duties were passed along to Kaltreider, and that Kaltreider's duties (after Lynch's discharge) overlapped somewhat with those which had been performed by Lynch. In his

28

deposition, Lynch testified that Kaltreider's duties had been roughly eighty percent (80%) clerical when the two of them were working together. (Document No. 38-7, p. 21). It is clear that they worked closely together during their period of concurrent employment with Johnstown Wire. (*Id.*, p. 28). Kaltreider testified that while he was technically available to help other Johnstown Wire employees, he acted as a *de facto* assistant to Lynch. (Document No. 38-6, p. 6). He described his job description as "all-inclusive." (*Id.*, p. 5). These factors weigh in Lynch's favor for purposes of Johnstown Wire's Motion for Summary Judgment, especially since the Court must view the facts, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *Troy Chemical Corp.*, 37 F.3d at 125-126.

The one factor which clearly weighs in favor of Johnstown Wire with respect to the "similarly situated" inquiry is the drastic difference in salary between Lynch and Kaltreider. The undisputed facts reveal that Lynch's annual salary was $80,256.00 at the time of his termination. (Document Nos. 32, p. 5, ¶ 33, 38, p. 4, ¶ 33). In November 2002, Lynch recommended that Kaltreider's salary be increased to $25,000.00, which was only a small fraction of Lynch's salary. (Document Nos. 38, p. 10, ¶ 32, 45, p. 3, ¶ 32). Kaltreider earned $32,054.66 in 2002 and $42,380.03 in 2003. (Document Nos. 38, p. 19, ¶ 106, 45, p. 7, ¶ 106). Neither figure approximates Lynch's earnings during the relevant period of time.

While the salary factor weighs in favor of Johnstown Wire, a reasonable jury could conclude that the "job function" and "supervisory authority" factors weigh in favor of Lynch. *Klinman*, 439 F.Supp.2d at 405. There is sufficient support in the record for Lynch's position to enable a reasonable jury to determine that Kaltreider's duties, at some point, became sufficiently independent of those of

29

Lynch to warrant a determination that Lynch was no longer acting as Kaltreider's *de facto* supervisor. (Document No. 38-6, p. 8). This is particularly true in light of Kaltreider's testimony that, upon his return from medical leave, Lynch was not doing as much work as he had done prior to his cardiac difficulties. *Id.* When "other factors relevant to the particular workplace" are considered, it becomes clear that Lynch and Kaltreider were jointly performing some duties that were not being performed by anyone else employed by Johnstown Wire. For instance, Buxbaum testified that while Robertson was able to assume Lynch's duties, nobody else would have been available to perform Kaltreider's duties had he been selected for termination. (Document No. 38-4, p. 16). Despite Johnstown Wire's contention that Lynch was able to perform duties which could not be performed by Kaltreider, it was Kaltreider who was viewed as indispensable and Lynch who was viewed as expendable.

When viewed in the light most favorable to Lynch, the nonmoving party, the evidence of record is sufficient to enable a reasonable jury to conclude that Lynch was replaced by a *sufficiently younger* individual (*i.e.*, Kaltreider) who was *similarly* situated (though clearly not *identically* situated) to him. Therefore, Lynch has established a *prima facie* case of age discrimination under the ADEA for purposes of Johnstown Wire's Motion for Summary Judgment, thereby shifting the burden of production to Johnstown Wire. In order to meet that burden, Johnstown Wire must "articulate some legitimate, nondiscriminatory reason" for Lynch's discharge. *Johnson v. The McGraw-Hill Companies*, 451 F.Supp.2d 681, 691 (W.D.Pa. 2006).

In his deposition, Robertson testified that it became necessary for Johnstown Wire to eliminate some salaried positions because of financial difficulties. (Document No. 38-9, p. 10). He explained

that, in January 2003, Johnstown Wire was "virtually out of cash[.]" *Id.* According to him, the situation in Iraq had helped to dry up demand.[4] *Id.* He stated that if no move had been made to cut costs, Johnstown Wire may have had to file for Chapter 11 bankruptcy. (Document No. 38-9, p. 19). Robertson's testimony was consistent with Johnstown Wire's argument that the specific individuals chosen for termination were selected because their jobs could be eliminated:

[Attorney Kunkel]: . . . can you just tell me why was Larry Keiser chosen for layoff?

[Robertson]: Again, we had a person working in the company as manager of engineering who had a strong operational background that gave us the chance to combine those two jobs, literally take out a position.

[Attorney Kunkel]: Now with regard to your son, I know you told me why he was let go. Was he replaced by anyone?

[Robertson]: Nobody, and even to this day has not been replaced. I might add he was by far the lowest salaried salesperson by a large amount.

[Attorney Kunkel]: What about Mr. Buczek, why was he selected?

[Robertson]: Some years before we had hired a person to come in and be our manager of maintenance. Ted had gone into the mode of really supporting all these capital projects. If you remember our cap ex sheet we were spending a ton of money. He's a

---

[4]The Court takes judicial notice of the fact that Operation Iraqi Freedom did not begin until March 19, 2003. *Falzerano v. Collier*, 535 F.Supp. 800, 801 (D.N.J. 1982)("It is in this context of general facts, well known in the area and subject to judicial notice under *Fed.Ev. Rule 201*, that the present complaint is reviewed and analyzed."). Lynch was informed of his impending termination eight days earlier. In his deposition, Robertson appears to attribute some of Johnstown Wire's financial problems to the situation in Iraq. (Document No. 38-9, p. 16)("But our results in November and December because of lack of demand and what was going on in Iraq and energy the results were so disastrous."). Although major combat operations against Saddam Hussein's regime had not yet commenced when Johnstown Wire made the decision to discharge Lynch, the Court takes judicial notice of the long standoff that preceded the current military conflict, and assumes that Robertson's comments about the conflict in Iraq refer to the crisis that preceded the invasion. (Document No. 38-9, p. 10)(noting that "the Iraqi conflict was starting").

31

great electrical engineer but really was totally devoted to capital projects. By the time 2003 came around we had no money for capital projects. And again, that position was eliminated.

(Document No. 38-9, pp. 22-23). Robertson further testified that Lynch's age was not a factor in the discharge decision, and that Lynch had been a good employee. (*Id.*, p. 15).

Buxbaum testified that Poole and Clark had not been involved in the decision to terminate Lynch, and that Lynch's discharge was not related to his performance. (Document No. 38-4, pp. 32-33). According to Buxbaum, the main consideration leading to the termination decision was the ability of Johnstown Wire to eliminate Lynch's position. (*Id.*, p. 32). Buxbaum and Robertson apparently reasoned that Lynch's duties could be performed by Robertson and Kaltreider, and that Johnstown Wire could save money by eliminating Lynch's job. *Id.*

Given the explanations provided by Robertson and Buxbaum for Johnstown Wire's decision to discharge Lynch, the Court concludes that Johnstown Wire has articulated a legitimate, nondiscriminatory reason for dismissing Lynch. *Johnson*, 451 F.Supp.2d at 691. This determination, however, does not end the inquiry. Although the Court views the present case as a genuine reduction-in-force case, Lynch may defeat Johnstown Wire's Motion for Summary Judgment by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Johnstown Wire's proffered reasons for its action that a reasonable jury could find them "unworthy of credence." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). In *Tomasso v. The Boeing Company*, 445 F.3d 702, 706-707 (3d Cir. 2006), the United States Court of Appeals for the Third Circuit noted that reduction-in-force ("RIF") cases are unique:

32

In ordinary times, employees are fired for poor performance; in a RIF, even qualified employees are laid off in order to reduce personnel. In fact, Wood testified that the individuals selected for layoff were not bad employees. But even in a genuine RIF (one that is motivated on a programmatic level by economic concerns), individuals may be selected for layoff on the basis of age. For this reason, even in a RIF, we use the *McDonnell Douglas* framework to expose such discrimination. The employer must have age-neutral reasons for deciding to lay off certain employees, and the employee can challenge these reasons as pretextual.

*Tomasso*, 445 F.3d at 707. In an attempt to establish that Johnstown Wire's reasons for terminating Lynch were pretextual, Lynch relies on Johnstown Wire's violation of the OWBPA, Johnstown Wire's (allegedly) inconsistent explanations regarding Kaltreider's duties, testimony establishing that Robertson had asked Lynch how much longer he intended to work, evidence that Robertson targeted older workers for termination, Robertson's references to "young" employees in his deposition testimony, and the EEOC's determination that Johnstown Wire violated the ADEA by terminating Lynch. (Document No. 43, pp. 15-21). As noted earlier, the Court does not understand Johnstown Wire's argument about the unreliability of the EEOC's determination to be an evidentiary objection to its consideration, but rather as an assertion that the determination is entitled to little or no weight. (Document No. 44, pp. 10-11). In any event, however, there is no need for the Court to dwell on this issue, since the record contains sufficient evidence of pretext even if the EEOC's determination is disregarded.

When asked about Johnstown Wire's lack of compliance with the OWBPA, Buxbaum testified that he was asking discharged employees to execute a waiver because he did not want them to file charges of discrimination with the EEOC or the Pennsylvania Human Relations Commission ("PHRC"). (Document No. 38-4, pp. 27-28). He indicated that he was not as concerned about lawsuits

33

as he was about discrimination claims being filed with government agencies. *Id.* Apparently, Buxbaum did not fully understand that the administrative filings were statutory prerequisites to the filing of a lawsuit. (*Id.*, p. 28)("I was not as familiar with the law as I am today.").

Buxbaum testified that the creation of Kaltreider's Materials Coordinator position had nothing to do with the decision to discharge Lynch. (*Id.*, p. 22). Nevertheless, he also testified that this position had been contemplated by Johnstown Wire before the March 2003 dismissals. (*Id.*, p. 21). He could not remember whether Lynch was made aware of Kaltreider's assumption of that position. *Id.* The position was apparently created in January 2003, while Lynch was still on medical leave. *Id.*

In September 2002, Robertson asked Lynch how long he was planning to work for Johnstown Wire. (Document Nos. 38, p. 11, ¶ 41, 45, p. 3, ¶ 41). Lynch's response was that he was planning to work for at least five more years. Robertson testified that he had asked this question at the request of Banc of America, due to a five-year vesting period for a stock option plan. (Document No. 38-9, pp. 21-22). Lynch apparently agreed to invest $20,000.00 into Johnstown Wire in exchange for a note and an equity position in the company. (Document No. 43, p. 18). In his deposition, Lynch testified that while he had been offered a chance to invest in Johnstown Wire immediately after Robertson had asked him how long he intended to work, he was unaware of the stock option plan. (Document No. 38-7, p. 19). It may be that Robertson was asking Lynch about his future plans for the purpose of obtaining information needed to implement the stock option plan. Indeed, the timing would seem to indicate as much, even if Lynch was not fully aware of why he was being asked how long he intended to work. Nonetheless, as Lynch points out in his brief, the Court must view the evidence, at this stage, in the light

34

most favorable to the nonmoving party. (Document No. 43, p. 18).

Lynch argues that Robertson targeted older workers when the reduction-in-force was implemented. Gindlesperger was terminated for performance-related reasons, at the direction of Poole and Clark. (Document Nos. 38, p. 14, ¶ 63, 45, p. 5, ¶ 63). Unlike the other four employees terminated in 2003, Gindlesperger was replaced. (Document No. 38-4, p. 31). Thus, he was not actually terminated because of the reduction-in-force decision, notwithstanding the fact that the decision to discharge him was made at the same time as the decision to cut salaried employees. Moreover, Robertson's son appears to have been discharged for performance-related reasons. (Document Nos. 38-4, p. 14, 38-7, p. 26, 38-9, p. 12). Consequently, the only three "good" employees to be discharged as a result of the reduction-in-force were Lynch, Keiser and Buczek, who were fifty-nine (59), forty-seven (47) and fifty-eight (58) years of age, respectively. (Document Nos. 38, p. 15, ¶ 76, 45, p. 5, ¶ 76). Lynch also calls the Court's attention to Robertson's references to "young" employees (*i.e.*, Kaltreider and Alan Morgart), which he believes to be evidence of discriminatory intent. (Document No. 43, pp. 19-20).

While the Court is unpersuaded that Robertson's use of the word "young" to describe Kaltreider constitutes compelling evidence of discriminatory animus on the basis of age, there are several inconsistencies in the rationale advanced by Johnstown Wire as a basis for implementing the reduction-in-force. For instance, Buxbaum testified that Johnstown Wire's goal was to save $500,000.00 by cutting salaried employees. (Document No. 38-4, p. 15). Nevertheless, he also stated that the salaries of employees chosen for discharge were not given much consideration. *Id.* He explained that the

35

$500,000.00 goal was not a "firm number," and that Johnstown Wire had intended to eliminate as many jobs as possible without jeopardizing the functioning of the company. *Id.* At the time of his deposition, Buxbaum did not even remember whether the $500,000.00 goal had been met. (*Id.*, p. 18). Moreover, it is undisputed that, in 2003, Johnstown Wire implemented a five percent (5%) across-the-board pay raise for its employees, which cost the company approximately $140,000.00. (Document Nos. 38, p. 16, ¶ 81, 45, p. 6, ¶ 81). When deposed, Lynch expressed doubt as to whether Johnstown Wire's financial trouble was the real reason for his discharge. (Document No. 38-7, p. 19).

In *Tomasso*, the United States Court of Appeals for the Third Circuit explained that if a defendant, in an attempt to justify an allegedly discriminatory action, "proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." *Tomasso*, 445 F.3d at 707, quoting *Fuentes*, 32 F.3d at 764, n. 7. The governing law recognizes that, in a given case, "the rejection of some explanations may so undermine the employer's credibility as to enable a rational factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales." *Tomasso*, 445 F.3d at 707. With that in mind, the Court notes that Buxbaum testified that Lynch was unable to be enrolled in the Johnstown Wire health plan because he was no longer going to be an active employee as of April 1, 2003. (Document No. 38-4, p. 22). Lynch's last day as a Johnstown Wire employee, of course, was March 31, 2003. (Document Nos. 38, p. 16, ¶ 83, 45, p. 6, ¶ 83). While this development may have been a mere coincidence, a reasonable jury could conclude that Johnstown Wire's decision to terminate Lynch at the time that it did was not coincidental. In so observing, the Court acknowledges that a decision to terminate Lynch on account of his health insurance costs would not have constituted

36

a violation of the ADEA. For purposes of § 623(a)(1), the dispositive question is whether Lynch was discharged *because of his age*. *Hazen Paper Company v. Biggins*, 507 U.S. 604, 610-614, 113 S.Ct. 1701, 1706-1708, 123 L.Ed.2d 338, 347-349 (1993). It is insufficient for Lynch to establish that he was discharged because Johnstown Wire did not want to absorb the cost of his health insurance. Nevertheless, a factfinder is entitled to consider an employer's false explanations as to material issues for purposes of the employer's credibility as to the ultimate issue of discriminatory intent. *Reeves*, 530 U.S. at 147, 120 S.Ct. at 2108, 147 L.Ed.2d at 120 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").

Although Robertson testified that the cost of insuring the former employees of Bethlehem Steel had been a concern, he indicated that it was not a factor in the decision to terminate Lynch. (Document No. 38-9, pp. 17-18). To some extent, this perceived inconsistency may be explained by Buxbaum's testimony. Buxbaum testified that most of the costs associated with the termination of the Bethlehem Steel health plan had related to hourly employees rather than salaried employees. (Document No. 38-4, p. 29). A reasonable jury, however, could infer from the timing of Lynch's discharge that Buxbaum's testimony is not entirely credible. When coupled with Buxbaum's testimony that Lynch's salary was not considered for purposes of making the termination decision, even though Johnstown Wire had a flexible savings benchmark of $500,000.00 to meet, this evidence could lead a reasonable jury to conclude that the reasons given by Johnstown Wire for Lynch's termination are "unworthy of credence." *Fuentes*, 32 F.3d at 765. While Lynch must go further to demonstrate that he was discharged *because of his age*, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of

37

circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147, 120 S.Ct. at 2108, 147 L.Ed.2d at 119-120. How persuasive it is in this case, of course, will be for the jury to decide. Accordingly, the Court must deny Johnstown Wire's Motion for Summary Judgment with respect to Lynch's ADEA claim.

## B. The Claims Under the FMLA

The counts against Robertson allege violations of the FMLA. (Document No. 1, ¶¶ 18-28). Subject to the certification requirements established by 29 U.S.C. § 2613, the FMLA entitles an eligible employee to a total of twelve (12) workweeks of leave during the course of a 12-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(D). Section 2612(c) permits such leave to be unpaid. Upon returning from such leave, an eligible employee is entitled "to be restored by the employer to the position of employment held by the employee when the leave commenced[,]" or "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(A)-(B). The statutory language relevant to Lynch's claims against Robertson provides:

§ 2615. Prohibited Acts

(a) Interference with rights. (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title [29 U.S.C. § 2611 *et seq.*].

(2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title [29 U.S.C. § 2611 *et seq.*].

38

(b) Interference with proceedings or inquiries. It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual--

(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this title [29 U.S.C. § 2611 *et seq.*];

(2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this title [29 U.S.C. § 2611 *et seq.*]; or

(3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this title [29 U.S.C. § 2611 *et seq.*].

29 U.S.C. § 2615. Johnstown Wire qualifies as a "person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year[,]" and Robertson is a "person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer[.]" 29 U.S.C. § 2611(4)(A)(i)-(ii)(I). Consequently, Robertson is an "employer" for purposes of the FMLA. Count I of Lynch's complaint alleges a violation of § 2615(a)(1), and Count II alleges a violation of § 2615(a)(2). (Document No. 1, ¶¶ 18-28).

Count I of Lynch's complaint alleges, in pertinent part, that "Defendant Robertson interfered with plaintiff's right to FMLA leave in violation of 29 U.S.C. § 2615(a)(1) by terminating plaintiff's employment because of his FMLA protected absences; failing to inform plaintiff of his rights under the FMLA; denying plaintiff leave in order for plaintiff to continue to attend cardiac rehabilitation and/or any other treatment related to plaintiff's serious health condition, and in failing to restore plaintiff to his position after he returned from FMLA qualifying leave." (Document No. 1, ¶ 23). In Count II of his complaint, Lynch alleges that "Defendant Robertson retaliated against the plaintiff when he

39

discharged him for taking FMLA-protected leave in violation of 29 U.S.C. § 2615(a)(2)." (*Id.*, ¶ 26). A regulation promulgated by the Department of Labor states that "individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of FMLA." 29 C.F.R. § 825.104(d). Courts in this circuit have held that such individual liability exists under the FMLA, and the Court does not understand Robertson to argue otherwise. *Hewett v. Willingboro Board of Education*, 421 F.Supp.2d 814, 817-818, n. 4 (D.N.J. 2006)("The Third Circuit has yet to decide the issue of individual liability under the FMLA. Both parties recognize, however, and this Court agrees, that the FMLA permits individual liability within the private sector."); *Smith v. Genesis Ventures I, LLC*, 2006 WL 3592330, at *4, 2006 U.S. Dist. LEXIS 89285, at *16 (E.D.Pa. December 8, 2006)("The Department of Labor's interpretation of the FMLA, along with a growing consensus among the courts that the FMLA permits individual liability, convince the Court that Smith's FMLA claims against Reagoso and Rosenthal should not be barred at this stage.")(footnotes omitted). Accordingly, the Court will address Counts I and II on the merits for purposes of Robertson's Motion for Summary Judgment.

Lynch's arguments, to some extent, seem to blur the distinction between Counts I and II of his complaint, making it difficult for the Court to distinguish between them. (Document No. 43, pp. 8-14). This lack of clarity is not solely the fault of Lynch. There is considerable confusion among courts of appeals and district courts concerning which types of FMLA claims are cognizable under which specific statutory provisions. Stacy A. Manning, *Application of the Interference and Discrimination Provisions of the FMLA Pursuant to Employment Termination Claims*, 81 Chi.-Kent.L.Rev. 741, 742-771 (2006)(evaluating the myriad of approaches taken by federal courts with respect to FMLA discharge

claims, and the inconsistent applications which sometimes occur even within the same circuit). In light of this confusion, it is easy to understand why the arguments raised by the parties in this case are not a model of clarity.[5] *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1124, n. 10 (9th Cir. 2001)("Some of the case law applying § 2615 erroneously uses the term 'discriminate' to refer to interference with exercise of rights claims. This semantic confusion has led many courts to apply anti-discrimination law to interference cases, instead of restricting the application of such principles–assuming they are applicable to FMLA at all–to 'anti-retaliation' or 'anti-discrimination' cases under §§ 2615(a)(2) and (b)."). It is clear that Lynch's complaint primarily concerns his discharge. Nevertheless, before discussing whether his discharge is properly characterized as an "interference" claim or a "retaliation" claim, the Court will briefly address the other allegations contained in Count I, some of which are not directly related to Lynch's discharge. (Document No. 1, ¶ 23).

To the extent that Lynch alleges that Robertson failed to inform him of his rights under the FMLA, the record supports his allegation. Indeed, Robertson testified that, at the time of Johnstown Wire's decision to discharge Lynch, he did not even know what the FMLA was. (Document No. 38-9, p. 15). Lynch's claim is apparently based in part on 29 C.F.R. § 825.208(a), which provides that "it is

---

[5]Some courts have found retaliatory discharge claims under the FMLA to be based directly on 29 U.S.C. § 2615(a)(2). *Arban v. West Publish. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003); *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002); *Constant v. Mellon Bank, N.A.*, 2006 WL 1851296, at *9, 2006 U.S. Dist. LEXIS 45092, at *25 (W.D.Pa. July 3, 2006). Others have found such retaliatory discharge claims to be based on 29 C.F.R. § 825.220(c). *Colburn v. Parker Hannifin/Nichols Portland Division*, 429 F.3d 325, 331 (1st Cir. 2005); *Conoshenti v. Public Service Electric & Gas Company*, 364 F.3d 135, 146-147, n. 9 (3d Cir. 2004); *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001); *Hicks v. The Tech Industries*, 2007 WL 1300774, at *15, 2007 U.S. Dist. LEXIS 32733, at *49 (W.D.Pa. May 3, 2007). There are also some courts which have been less specific as to the precise statutory (or regulatory) basis for retaliatory discharge claims under the FMLA. *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999); *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159-160 (1st Cir. 1998).

the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee . . ." It may also be partially based on 29 C.F.R. § 825.301, which details the types of notices which should be provided to eligible employees by their employers. In any event, however, a "categorical penalty [for technical violations concerning notice requirements] is incompatible with the FMLA's comprehensive remedial mechanism." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89, 122 S.Ct. 1155, 1161, 152 L.Ed.2d 167, 176 (2002). "To prevail under the cause of action set out in § 2617, an employee must prove, as a threshold matter, that the employer violated § 2615 by interfering with, restraining, or denying his or her exercise of FMLA rights." *Id.* The United States Court of Appeals for the Third Circuit has determined that a failure to advise claim can be cognizable as an "interference" claim under § 2615(a), but only if the plaintiff is able to show prejudice resulting from his or her employer's failure to comply with the applicable notice requirements. *Conoshenti v. Public Service Electric & Gas Company*, 364 F.3d 135, 142-146 (3d Cir. 2004). Since the record contains no evidence that Lynch was prejudiced by any alleged failure on the part of Robertson to advise him of his rights under the FMLA, he has no cognizable FMLA claim under this theory.

Count I also alleges that Robertson denied Lynch leave to attend cardiac rehabilitation sessions after his return to work. (Document No. 1, ¶ 23). The record contains no evidence to support this allegation. In his deposition, Lynch testified that nobody at Johnstown Wire interfered with his cardiac rehabilitation sessions. (Document No. 38-7, p. 23). Count I also alleges that Robertson failed to restore Lynch to his position after his return from medical leave. (Document No. 1, ¶ 23). This allegation is also unsupported by the record, since Lynch testified that he had returned to his regular

42

position after his absence. (Document No. 38-7, p. 24). Therefore, Robertson is clearly entitled to summary judgment with respect to the FMLA claims which are not based on the specific decision to discharge Lynch.

Lynch appears to allege that his discharge violated both the "interference" and the "retaliation" provisions of the FMLA. (Document No. 1, ¶¶ 23, 26). Retaliation for taking an entitled leave under the FMLA does not fall within the literal scope of the FMLA's "retaliation" provisions. Section 2615(a)(2) makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual *for opposing any practice made unlawful* by [the FMLA]." 29 U.S.C. § 2615(a)(2)(emphasis added). Lynch does not allege that he was discharged for opposing an unlawful practice. Section 2615(b) makes it unlawful for an employer to discharge (or otherwise discriminate against) an employee in retaliation for instituting an FMLA-related charge, providing information in connection with a related proceeding, or testifying in connection with a related proceeding. 29 U.S.C. § 2615(b)(1)-(3). Lynch does not allege that he was discharged for such a purpose. Consequently, his FMLA claim does not clearly fall within the applicable statutory language. *Conoshenti*, 364 F.3d at 146-147, n. 9.

Although there is considerable confusion among the courts of appeals and the district courts as to the precise legal grounds for an FMLA discharge claim of the kind advanced by Lynch, the United States Court of Appeals for the Third Circuit has concluded that such a claim is cognizable under 29 C.F.R. § 825.220(c), which provides:

An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example, if an employee on leave without

pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.

29 C.F.R. § 825.220(c). In *Conoshenti v. Public Service Electric & Gas Company*, 364 F.3d 135, 146-147, n. 9 (3d Cir. 2004), the Third Circuit determined that § 825.220(c) was the basis for retaliatory discharge claims under the FMLA, following the Ninth Circuit's decision in *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112 (9th Cir. 2001). Although the Third Circuit viewed § 825.220(c) as an implementation of the FMLA's "interference" provisions, it noted that the text of § 825.220(c) speaks in terms of "discrimination." *Conoshenti*, 364 F.3d at 146-147, n. 9 ("Even though 29 C.F.R. § 825.220(c) appears to be an implementation of the 'interference' provisions of the FMLA, its text unambiguously speaks in terms of 'discrimination' and 'retaliation,' and we shall, of course, apply it in a manner consistent with that text.").

The characterization of Lynch's FMLA claim is of considerable importance, since general "interference" claims are distinct from "retaliation" claims. "In order to assert a claim of deprivation of entitlements, the employee only needs to show that he was entitled to benefits under the FMLA and that he was denied them." *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005). Under such a theory, there would be no need for Lynch to demonstrate that he was treated differently than employees who had not taken an FMLA leave. *Id.* "An interference action is not about discrimination," but rather "about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Id.* at 120. When faced with an interference claim of this kind, an employer "cannot justify

44

its actions by establishing a legitimate business purpose for its decision." *Id.* at 119-120. In such a case, there is no need for a burden-shifting analysis under the *McDonnell Douglas* framework, since the substantive FMLA claim is not related to a charge of discrimination. *Sommer v. The Vanguard Group*, 461 F.3d 397, 399 (3d Cir. 2006).

Having reviewed Lynch's arguments, the Court is convinced that his FMLA claim is not cognizable under the generalized "interference" theory discussed above. (Document No. 43, pp. 7-15). The record is totally devoid of evidence that Robertson interfered with the exercise of Lynch's FMLA rights. As noted earlier, some of the allegations in Count I of Lynch's complaint were later contradicted by Lynch's deposition testimony. Consequently, Robertson is entitled to summary judgment insofar as Lynch asserts an FMLA-based "interference" claim unrelated to the retaliatory discharge theory predicated on § 825.220(c) and recognized in *Conoshenti*.

It remains to be determined whether Robertson is entitled to summary judgment with respect to Lynch's retaliatory discharge claim under the FMLA, which appears to be the sole basis for Count II and a partial basis for Count I of the complaint. (Document No. 1, ¶¶ 23, 26). In *Conoshenti*, the United States Court of Appeals for the Third Circuit explained that, to succeed on a retaliation claim brought under § 825.220(c), a plaintiff must establish that: (1) he or she exercised a right provided by the FMLA; (2) he or she suffered an adverse employment (or materially adverse)[6] decision; and (3) the

[6]The Court has inserted the words "materially adverse decision" to incorporate the decision of the United States Supreme Court in *Burlington Northern & Sante Fe Railway Co. v. White*, 126 S.Ct. 2405 (2006). In *Burlington Northern*, the Supreme Court construed the words "discriminate against," as they appeared in 42 U.S.C. § 2000e-3(a), to include "materially adverse" actions which may not necessarily qualify as adverse employment decisions. *Burlington Northern*, 126 S.Ct. at 2411-2416. Although *Burlington Northern* concerned only the construction of § 2000e-3(a), its reasoning has been applied to other anti-retaliation provisions. *Johnson v. The McGraw-Hill Companies*, 451 F.Supp.2d 681, 710-712 (W.D.Pa. 2006). Several courts have concluded that the *Burlington Northern* standard is applicable to retaliation claims brought under

adverse employment decision was *causally related* to his or her exercise of an FMLA-based right. *Conoshenti*, 364 F.3d at 146. Exactly what constitutes a *causal* relationship is of central importance in this case, requiring the Court to examine this standard with particularity. Before doing so, however, the factual context of the present circumstances must be considered.

In opposition to Robertson's Motion for Summary Judgment, Lynch relies on Robertson's deposition testimony. (Document No. 43, p. 9). Lynch returned to work on February 18, 2003. (Document Nos. 38, p. 13, ¶ 56, 45, p. 4, ¶ 56). By that time, however, Robertson had already told Buxbaum that Lynch's discharge would be "one of [Johnstown Wire's] moves." (Document No. 38-9, p. 14). Robertson testified that his meeting with Buxbaum occurred in January 2003, while Lynch was still on medical leave. *Id.* Robertson also testified as follows:

> [Attorney Kunkel]: Did you feel that Mr. Lynch would be a good one for layoff because you were essentially doing that work with Mr. Kaltreider while he was off?

> [Robertson]: It probably gave me additional confidence that that change that I was contemplating was possible and would not result in any–you know, any detrimental issues as far as the company's performance was concerned.

---

the FMLA. *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1171, n. 2 (10th Cir. 2006); *Foraker v. Apollo Group, Inc.*, 2006 U.S. LEXIS 85737, at *4-7, 2006 WL 3390306, at *2 (D.Ariz. November 22, 2006); *Campbell v. Wash. County Pub. Library*, 2006 U.S. Dist. LEXIS 64397, at *17-19, 2006 WL 2612985, at *6 (S.D.Ohio September 8, 2006); *Steele v. Kroenke Sports Enterprises*, 2006 WL 2038517, at *8, 2006 U.S. Dist. LEXIS 48576, at *25 (D.Colo. July 18, 2006). A court in this circuit has concluded that *Burlington Northern* provides "guidance" in retaliation cases brought under the FMLA. *Grosso v. Federal Express Corporation*, 467 F.Supp.2d 449, 459 (E.D.Pa. 2006)("The Third Circuit has not yet had an opportunity to determine whether the standard enunciated in *Burlington Northern* applies to FMLA retaliation claims. However, several courts that have reached this issue have applied *Burlington Northern* to claims of retaliation under the FMLA."). Since a "retaliatory discharge" is obviously an "adverse employment decision" for purposes of *Conoshenti*, it is not necessary for this Court to decide whether the words "discriminating against," as they appear in § 825.220(c), prohibit a broader swath of "materially adverse" decisions than those encompassed within the more narrow category of "adverse employment" decisions discussed in *Conoshenti*.

\*\*\*

[Attorney Kunkel]: Did you tell him that one of the reasons for eliminating his position was because you guys had been able to operate well during his absence?

[Robertson]: I do not recall that. But that was in my mind, the fact that we had been able to do this was a fact.

(Document No. 38-9, pp. 14, 18). Lynch contends that this testimony confirms Robertson's consideration of his medical leave as a "negative factor" in the decision to terminate him. (Document No. 43, p. 9). He apparently believes that Lynch's testimony constitutes "direct evidence" to that effect. Robertson argues that this testimony establishes that the ability of Johnstown Wire to function in Lynch's absence had merely *confirmed* the correctness of his decision to terminate Lynch, and that this confirmation was simply an incidental consequence of Lynch's unavailability during that period of time. (Document No. 44, p. 9).

Having reviewed Robertson's testimony and the arguments raised by the parties, the Court is not convinced that Robertson's testimony constitutes direct evidence of *discrimination* for purposes of § 825.220(c). Statutory and regulatory provisions must always be read within the context of the overall statutory scheme of which they are a part. Section § 2614(a)(3)(B) makes it abundantly clear that nothing in the FMLA should be construed to entitle any restored employee to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). The words "negative factor," as they appear in § 825.220(c), must be read in that light. Moreover, the plain language of § 825.220(c) describes using one's FMLA leave as a "negative factor" in employment decisions as an

47

*example* of *discrimination*. 29 C.F.R. § 825.220(c). The regulation speaks in terms of *discrimination*, thereby confirming that its protective shield prevents *retaliatory discharge* rather than discharge pursuant to a legitimate business purpose. Although a "legitimate business purpose" is no justification for interfering with an eligible employee's FMLA rights, a "legitimate business purpose" can justify actions which may otherwise be viewed as *discriminatory*. *Callison*, 430 F.3d at 119-120 ("Further, the employer cannot justify its actions by establishing a legitimate business purpose for its decision. An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA."). Since Lynch's retaliatory discharge claim is properly characterized as a claim of discrimination, the *causal* relationship referred to in *Conoshenti* must be viewed in that light. *Conoshenti*, 364 F.3d at 146. In this context, Lynch can establish that his discharge was *causally related* to his medical leave by showing that his leave caused Robertson to act with a *retaliatory animus*. *Id.* at 147 (referring to *direct evidence* of *retaliatory animus*).

To defeat Robertson's Motion for Summary Judgment, Lynch must provide sufficient evidence to enable a reasonable jury to conclude that Robertson terminated him in *retaliation* for taking an FMLA leave. It is not sufficient for Lynch to merely show that his leave had the unintended, incidental effect of convincing Robertson that Johnstown Wire could continue to function without him. The words "negative factor" *explain*, rather than *qualify*, the words "discriminating against" as they appear within the language of § 825.220(c). If Robertson had considered Lynch's medical leave for a purpose inextricably linked with the leave itself, such as Lynch's attendance record, Lynch could establish that his FMLA leave constituted a "negative factor" in Robertson's decision to discharge him. *Hicks v. The Tech Industries*, 2007 WL 1300774, at *16-19, 2007 U.S. Dist. LEXIS 32733, at *52-60 (W.D.Pa. May

48

3, 2007). The fact that Lynch's medical leave may have had an incidental effect on Robertson's decision (*i.e.*, by informing the inquiry as to whether Lynch's position was expendable) does not mean that Robertson *discriminated against* Lynch within the meaning of § 825.220(c), nor does it mean that Lynch's leave was *itself* considered as a "negative factor" in Robertson's ultimate decision. *Schlifke v. Trans World Entertainment Corporation*, 479 F.Supp.2d 445, 452 (D.Del. 2007 )(evaluating *causation* pursuant to the question of whether *discrimination* was more likely than not a motivating or determinative *cause* of an adverse employment action). Accordingly, Robertson's testimony does not constitute "direct evidence" that Lynch's medical leave was considered as a "negative factor" in the decision to discharge him. *Starceski*, 54 F.3d at 1096, n. 4 (describing direct evidence of discrimination as evidence "so revealing of *discriminatory animus* that it is not necessary to rely on any presumption from the *prima facie* case to shift the burden of production")(emphasis added).

The absence of direct evidence, of course, does not end the inquiry. Since Lynch's retaliatory discharge claim under the FMLA is properly characterized as a claim of *discrimination* rather than as a claim of *interference*, the Court must apply the burden-shifting framework established in *McDonnell Douglas* to make a determination for purposes of summary judgment. *Schlifeke*, 479 F.Supp.2d at 451-452 ("Retaliation claims under the FMLA are analyzed under the burden shifting framework of *McDonnell Douglas*[.]"); *Hicks*, 2007 WL 1300774, at *16, 2007 U.S. Dist. LEXIS 32733, at *50-51 ("In analyzing retaliation claims under the FMLA, courts look to the legal framework established for Title VII claims."). It is undisputed that Lynch engaged in activity protected by the FMLA (*i.e.*, he took a leave of absence "[b]ecause of a serious health condition" for purposes of § 2612(a)(1)(D)), and that he suffered an adverse employment action (*i.e.*, he was discharged). *Schlifke*, 479 F.Supp.2d at 452.

49

For purposes of the *prima facie* inquiry, the only question remaining is whether there was a *causal* connection between Lynch's medical leave and Robertson's decision to terminate him (*i.e.*, whether Robertson was motivated by a discriminatory animus resulting from Lynch's medical leave). *Id.*

Although the Court has already concluded that Robertson's testimony does not constitute "direct evidence" of discrimination, given the proper construction of the words "discriminating against" and "negative factor" within the language of § 825.220(c), a reasonable jury could conclude that the circumstances of Lynch's dismissal give rise to an *inference* of discrimination. Robertson testified that the decision to terminate Lynch had already been made by mid-February 2003, when Lynch returned from his medical leave. (Document No. 38-9, p. 14). He indicated that Johnstown Wire's ability to function in Lynch's absence had given him "additional confidence" that Johnstown Wire could continue to operate without Lynch's services. (*Id.*, p. 14). Robertson also denied that Lynch's illness had impacted his ability to perform his duties, or that Lynch's performance had dropped off after the emergence of cardiac problems. (*Id.*, p. 18)("He was back functioning, looked like he was doing great. It had no impact."). Kaltreider, however, testified that Lynch was not doing much work after returning from his medical leave. (Document No. 38-6, p. 8). Thus, there is a clear inconsistency between the testimony of Robertson and Kaltreider as to Lynch's post-leave performance. Given Robertson's testimony that the decision to terminate Lynch had been made during Lynch's medical leave, as well as the inconsistency between the testimony of Robertson and Kaltreider as to Lynch's performance between February 18, 2003, and March 11, 2003, a reasonable jury could infer that Lynch's FMLA leave motivated Robertson's decision to dismiss Lynch.

50

To shift the burden of production back to Lynch, Robertson must "articulate some legitimate, nondiscriminatory reason" for discharging Lynch. *Johnson*, 451 F.Supp.2d at 691. The Court is satisfied that Robertson has met this burden. He testified that Lynch, like the other salaried employees who were terminated in March 2003, was discharged because Johnstown Wire needed to eliminate his position for financial reasons. (Document No. 38-9, pp. 22-23). This explanation is corroborated by the testimony of Buxbaum, who testified that Lynch's job could be performed by Robertson and Kaltreider, thereby making the position expendable. (Document No. 38-4, p. 32). Moreover, four other employees were terminated at the same time as Lynch, three of whom were terminated for financial reasons and none of whom had recently returned from a leave of absence. (Document Nos. 38, p. 15, ¶ 76, 45, p. 5, ¶ 76). Consequently, Robertson has clearly articulated a legitimate, nondiscriminatory reason for his decision.

The burden having been shifted back to Lynch, he must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Robertson's proffered reasons for his action that a reasonable jury could find them to be "unworthy of credence." *Fuentes*, 32 F.3d at 765. As noted earlier, even in a genuine reduction-in-force case, it is possible for individuals to be selected for termination on the basis of impermissible factors. *Tomasso*, 445 F.3d at 707. To defeat Robertson's Motion for Summary Judgment, Lynch must point to some evidence, direct or circumstantial, from which a reasonable jury could either (1) disbelieve Robertson's articulated reasons for the discharge or (2) believe that an invidious discriminatory reason (*i.e.*, retaliation for Lynch's taking FMLA leave) was more likely than not a motivating or determinative cause of Robertson's decision. *Iadimarco v. Runyon*, 190 F.3d 151, 165-166 (3d Cir. 1999). Nevertheless, if Lynch can point to evidence sufficient to

discredit Robertson's proffered reasons for discharging Lynch, it is not necessary for Lynch to come forward with *additional evidence* of discrimination beyond that necessary to establish a *prima facie* case. *Id.*; *Fuentes*, 32 F.3d at 764.

Lynch's contention that Robertson retaliated against him for taking FMLA leave is undermined somewhat by the fact that four other individuals were also discharged at the same time. Nevertheless, to defeat a motion for summary judgment, "the employee need not always offer evidence sufficient to discredit all of the rationales advanced by the employer." *Tomasso*, 445 F.3d at 707. Although Buxbaum testified that Johnstown Wire sought to save $500,000.00 by terminating salaried employees, he indicated that the salaries of those employees were not given much consideration throughout the deliberative process. (Document No. 38-4, p. 15). When deposed, he could not remember whether the $500,000.00 target had been met. (*Id.*, p. 18). Despite its alleged financial difficulties, Johnstown Wire implemented a five percent (5%) across-the-board pay raise. (Document Nos. 38, p. 16, ¶ 81, 45, p. 6, ¶ 81). This apparently cost Johnstown Wire $140,000.00. *Id.* While it may be true that Robertson's decision to terminate Lynch was motivated solely by a mandate to cut costs, a reasonable jury could conclude otherwise. For this reason, the Court must deny Robertson's Motion for Summary Judgment with respect to Lynch's claim of retaliatory discharge under the FMLA.

There is a fine line between relying on the ability of an employer to operate without an employee on FMLA leave as a partial basis for discharge and discharging that employee in *retaliation* for taking FMLA leave. While the former is legal, the latter is not. Whether Robertson crossed that line will be for the jury to decide. Nevertheless, in order to prevail in his retaliatory discharge claim under the

FMLA, Lynch will have to do more than make a showing that, in his absence, Robertson came to the realization that Johnstown Wire could get by without him. Instead, he will have to show that Robertson selected him for termination *because* he had taken FMLA leave, or *because* he was attending cardiac rehabilitation sessions (*i.e.*, intermittent or reduced leave under § 2612(b)). At this stage, the Court must view the facts, and all reasonable inferences drawn therefrom, in favor of Lynch, the nonmoving party. *Troy Chemical Corp.*, 37 F.3d at 125-126. How these same facts and inferences will *ultimately* be viewed is for the jury to decide.

## VI. CONCLUSION

There is a genuine issues of material fact as to whether Lynch was discharged because of his age for purposes of 29 U.S.C. § 623(a)(1). Johnstown Wire's Motion for Summary Judgment (Document No. 31) must, therefore, be denied with respect to Lynch's claim under the ADEA. The record is totally devoid of evidence to support Lynch's allegation in Count I that Robertson *interfered with* his exercise of statutory rights secured by the FMLA. Consequently, Robertson's Motion for Summary Judgment (Document No. 31) must be granted insofar as Count I is construed to allege an FMLA *interference* claim. Nevertheless, there is a genuine issue of material fact as to whether Robertson *discriminated against* Lynch in retaliation for taking medical leave available under the FMLA. 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave."). Accordingly, Robertson's Motion for Summary Judgment (Document No. 31) must be denied with respect to Count II, and with respect to Count I insofar as it is based on a theory of *retaliatory* discharge.

An appropriate Order follows.

**AND NOW**, this 17th day of August, 2007, this matter coming before the Court on the Defendants' Motion for Summary Judgment (Document No. 31), IT IS HEREBY ORDERED that Johnstown Wire Technologies' Motion for Summary Judgment is **DENIED** with respect to Plaintiff's claim under the Age Discrimination in Employment Act [29 U.S.C. § 621 *et seq.*], that Robertson's Motion for Summary Judgment is **GRANTED** with respect to Plaintiff's interference claim under the Family and Medical Leave Act [29 U.S.C. § 2601 *et seq.*], and that Robertson's Motion for Summary Judgment is **DENIED** with respect to Plaintiff's retaliatory discharge claim under 29 C.F.R. § 825.220(c).

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

54